**ANCHOR SALES & SERVICE CO., INC., Appellant,**

v.

**DIVISION OF EMPLOYMENT SECURITY DIVISION, Respondent.**

**No. WD 53370.**

Missouri Court of Appeals, Western District.

May 20, 1997.

Jeffrey S. Eastman, Keleher & Eastman, Gladstone, for appellant.

Ninion S. Riley, Cynthia Quetsch, Jefferson City, for respondent.

Before LAURA DENVIR STITH, P.J., and BRECKENRIDGE and HANNA, JJ.

LAURA DENVIR STITH, Presiding Judge.

Anchor Sales & Service Co., Inc. (hereinafter Anchor Sales) appeals the decision of the Labor and Industrial Relations Commission, finding it liable for the unpaid unemployment tax assessments of AES of Kansas City, Inc (AES). The correctness of that determination depends on whether Anchor Sales can be considered AES's "predecessor" as that term is used in the Missouri Employment Security Law. Finding that Anchor Sales cannot be considered AES's "predecessor" under the provisions of the Missouri Employment Security Law, we affirm the decision of the Commission.

## I. FACTUAL BACKGROUND AND LEGAL CONTENTIONS

Anchor Sales is a Missouri corporation engaged in the sale and service of material handling equipment. In the second quarter of 1993, Anchor Sales fired its field operations division employees and began leasing field operations workers from AES, an employee leasing company. All of AES's eleven employees were leased to Anchor Sales. Seven of them had previously been directly employed by Anchor Sales but had been fired at the end of the first quarter of 1993 so that Anchor Sales could lease field operations workers from AES instead.

The Missouri Division of Employment Security manages the unemployment insurance program in Missouri. It collects payroll taxes from Missouri employers and pays benefits to the unemployed. *See Graves v. Meystrik*, 425 F.Supp. 40, 41 (E.D.Mo.1977) (describing the unemployment insurance program in Missouri). The Division maintains an account for each employer who is subject to the Missouri Employment Security Law. § 288.100, RSMo 1986 (Cum.Supp. 1993).[1] Each such employer pays quarterly contributions into its account for each of its employees. The contributions are based on the first $7,500 of taxable wages that it or its predecessor paid to its employees during the year, and are multiplied by a rate determined by the employer and its predecessor's unemployment history. §§ 288.036; 288.090; 288.100.

During the second and third quarters of 1993, AES owed the Division contributions on the first $7,500 in wages it paid to each of its employees. The Division assessed these contributions, which totalled for all employees $1,419.09 for the second quarter and $202.95 for the third quarter. AES did not pay these assessments and the Division was unsuccessful in its attempts to collect from AES. During its investigation of AES, however, the Division learned that AES was a non-bonded leasing company that leased 100% of its employees to Anchor Sales. The Division then attempted to recover the unemployment tax assessments for AES's employees from Anchor Sales under Section 288.032.2, which provides that employers of leased employees are jointly and severally

---

1. All statutory references are to RSMo 1986 as supplemented by the 1993 Cumulative Supplement unless otherwise noted.

liable for unpaid contributions if the leasing company is not bonded.[2]

Pursuant to this section, the Division assessed Anchor Sales for AES's unpaid employee contributions. Anchor Sales concedes that it is jointly and severally liable for AES's unemployment tax assessments because AES failed to post the required bond or other financial security. Anchor Sales claims, however, that the Division should have credited it for the contributions it made for the seven AES-leased workers whom it had previously employed during the first quarter of 1993.

■ The Commission found that Anchor Sales was not entitled to such credit. Anchor Sales appeals the Commission's decision.[3] Our review of the Commission's decision is limited to questions of law and to a determination of whether the facts as found by the Commission are supported by competent and substantial evidence or were procured by fraud. *See Custom Furs v. Hopper Furs, Ltd.*, 923 S.W.2d 505, 506 (Mo.App. 1996). We are not bound by the Commission's conclusions of law, nor its application of the law to the facts. *Division of Employment Sec. v. Taney County Dist. R–III*, 922 S.W.2d 391, 393 (Mo. banc 1996).

## II. *APPLICATION OF GOVERNING LAW*

■ Employer contributions to the employment security tax are based on the wages they have paid their employees in the taxable year. The employer contributions are, however, capped by a statutory ceiling on taxable wages. Under Section 288.036 RSMo Cum.Supp.1993, only the first $7,500 in wages were considered for purposes of determining the amount of contributions due and contribution rates in 1993. Section 288.036 states:

> "Wages" means all remuneration, payable or paid, for personal services ... The term "wages" shall not include:
>
> (1) For the purpose of determining the amount of contributions due and contribution rates, that part of the remuneration for employment *paid to an individual by an employer or the employer's predecessors* which is in excess of ... seven thousand five hundred dollars for the calendar year 1993,....

(emphasis added). Section 288.036 thus looks at the wages paid by "an employer or the employer's predecessors" to determine the amount due, rate of contribution, and when the ceiling on taxable wages has been reached. This means that, unless an employer shows that a "predecessor" company has already paid unemployment tax for those specific employees for that year, it must pay unemployment tax on the first $7,500 of wages it pays to those specific employees, regardless of whether those employees have worked for another, unrelated employer earlier in that same year and that other, unrelated employer made any unemployment tax contributions for those employees. While this means that multiple employers may pay unemployment tax on the same employee

---

**2.** Subsection 2 of Section 288.032 provides in part:

(1) Notwithstanding any other provisions of this law, any employer ... that meets the definition of "lessor employing[ unit", as defined in subdivision (4) of this subsection, shall be liable for contributions on wages paid by the lessor employing unit to individuals performing services for client lessees of the lessor employing unit. Unless the lessor employing unit has timely complied with the provisions of subdivision (2) of this subsection, any employer ... leasing employees from any lessor employer unit shall be jointly and severally liable for any unpaid contributions, interest and penalties due under this law from any lessor employing unit attributable to wages for services performed for the client lessee entity by employees leased to the client lessee entity....

(2) In order to relieve client lessees from joint and several liability and the separate reporting requirements imposed under this subsection, any lessor employing unit may post and maintain a surety bond[, securities, irrevocable letter of credit, or certificate of deposit].

....

(4) As used in this subsection, the term "lessor employing unit" means an independently established business entity which engages in the business of providing leased employees to any other employer ... referred to in this subsection as a client lessee.

**3.** Because the judgment appealed from occurred after the effective date of § 288.210, RSMo Cum. Supp.1996, appeal of the Commission's decision is directly to this Court.

during the same year, it avoids the need for the Division or later employers to keep track of where each employee has previously worked and whether previous employers have fully paid their tax; each employer's obligation is independent of any other employer's obligation.

As noted, the statute makes an exception for situations in which the employees were previously employed by an employer's predecessor company. In such cases, the successor company gets to take a credit for any payments made by its predecessor. It is therefore to a company's advantage to claim that it has a predecessor which has paid the required unemployment taxes.

■ This is what Anchor Sales claims should occur here. It stands in the shoes of AES, and must pay the amounts which AES should have paid. It argues, however, that it was in fact a predecessor employer to AES as to the seven workers that it employed before AES did so. Therefore, it argues, it should have been credited for its unemployment tax contributions from the first quarter of 1993 for those seven employees. If it is not, appellant argues, it would in effect be required to pay the unemployment tax on the first $15,000 earned by each of those employees—that is, tax on the first $7,500 paid by it for each of these seven employees in the first quarter, and tax on the first $7,500 paid by AES for these same employees in the second and third quarters. Its total payments would thus be twice the statutory ceiling for 1993. Therefore, it argues, the Division erred in assessing it for AES's unpaid contributions for those seven employees as to which it had already paid contributions.

We disagree. Anchor Sales, in effect, argues that it should be given credit for its prior payments because it was the predecessor employer of seven of AES's *employees.* Section 288.036 does not state that additional payments will not be due if they were made by the *employee's* predecessor (i.e., prior) employer; it states that additional payments shall not be due if they were made by the *employer's* predecessor. This key distinction is determinative, both on its face and when considered in the context of other sections of the Employment Security Law.

"Predecessor employer" is not defined by Section 288.036, but it is defined in Section 288.110. That section terminates the liability of a predecessor employer if its successor employer "acquired substantially all of the business" of the predecessor employer. In so providing, the statute sets out a test for determining whether a company is a "successor employer," the converse of a "predecessor employer." It states:

> Any ... employing unit which has acquired substantially all of the business of an employer ... and in respect to which the division finds that immediately after such change such business of the predecessor employer is continued without interruption solely by the successor, shall stand in the position of such predecessor employer in all respects, including the predecessor's separate account, actual contribution and benefit experience, annual payrolls, and the liability for current or delinquent contributions, interest and penalties.... When the division has determined that a successor or successors stand in the position of a predecessor employer, the predecessor's liability shall be terminated as of the date of the acquisition.

§ 288.110. Cases interpreting this section have focused on the plain and ordinary meaning of the statutory language. *See Taney County Dist. R–III,* 922 S.W.2d at 393–95 (construing the terms "acquired," "business," and "substantially all," and finding that a school district stood in the place of another school district because it clearly acquired "substantially all" of the other school district's business in a forced school district consolidation); *Custom Furs,* 923 S.W.2d at 506–07 (ruling that a company stood in the place of another for purposes of the Employment Security Law because it found substantial and competent evidence that the company acquired substantially all of the other company's business when it purchased the inventory, accounts receivable, and goodwill of the business and operated the business under the same name for several months).

Applying the statute here, it is clear that AES did not acquire "substantially all," or indeed any, of Anchor Sales' business. AES was an entirely separate employee-leasing

company. Anchor Sales continued to operate as it had before. It merely changed its employment relationship with its field operations workers. Since Anchor Sales is not AES's predecessor, the two companies are treated like any other two unrelated business entities. As a result, Anchor Sales cannot claim credit for its prior payments on behalf of the seven employees that it had previously employed, any more than could the company that previously employed the other four AES employees. Each company's obligations are considered separately for purposes of unemployment tax obligations.

This analysis comports with its basic structure and purpose of the Employment Security Law. Employers are required to contribute at different rates depending on the type of business they conduct. *See* § 288.090.2. In addition, the contribution rates of individual employers are affected by their experience rating. *See* §§ 288.100; 288.120. Therefore, companies that conduct different businesses, such as Anchor Sales (sale and service of material handling equipment) and AES (employee-leasing), are treated differently by the law.

Further, as the Commission notes, by leasing employees instead of hiring its own employees, Anchor Sales presumably sought some sort of financial or other business benefit. By using a non-bonded leasing company, however, Anchor Sales assumed the risk of being jointly and severally liable for that company's employee contributions, as is clearly required in Section 288.032.2 in the case of a defaulting non-bonded company. Having freely chosen to lease rather than directly hire its field operations workers, Anchor Sales cannot now be heard to complain about the tax burden inherent in doing business in that manner. *See Williams Cos. v. Director of Revenue,* 799 S.W.2d 602, 605 (Mo. banc 1990), *cert. denied* 501 U.S. 1260, 111 S.Ct. 2916, 115 L.Ed.2d 1079 (1991); *Mid–America Television Co. v. State Tax Comm'n,* 652 S.W.2d 674, 681 (Mo. banc 1983), *cert. denied,* 465 U.S. 1065, 104 S.Ct. 1413, 79 L.Ed.2d 740 (1984). In other words, it incurred greater tax liability for itself only because it chose to switch to a non-bonded leasing company after the first quarter. It

must accept both the good and bad aspects of that business decision.

■■■ Our interpretation of the statutes also furthers the fundamental purpose of the Employment Security Law: to provide benefits to persons unemployed through no fault of their own. *See Aaron's Automotive Prods., Inc. v. Division of Employment Sec.,* 926 S.W.2d 229, 231 (Mo.App.1996). To this end, the law is liberally construed in favor of compensation and disqualifying provisions are strictly construed. *Ford v. Labor & Indus. Relations Comm'n,* 841 S.W.2d 255, 257 (Mo.App.1992). As a result, the taxing provisions of the law are incidental to its paramount and remedial purpose of relief. *Beal v. Industrial Comm'n,* 535 S.W.2d 450, 458 (Mo.App.1975). By not allowing an employer like Anchor Sales to receive credit against assumed liability, the law encourages employers to use bonded leasing companies, reduces the administrative burden that would result from trying to track all employees' work histories, and ensures that sufficient contributions are made for each covered employee.

For the aforementioned reasons, the decision of the Labor and Industrial Relations Commission is affirmed.

All concur.