Albert D. SMITH, Petitioner-Appellant,

v.

LABOR AND INDUSTRIAL RELATIONS COMMISSION OF MISSOURI, Missouri Division of Employment Security, and Foundation Building Company, Respondents.

No. WD34458.

Missouri Court of Appeals, Western District.

Aug. 16, 1983.

Steven L. Hobson, Legal Aid of Western Mo., Kansas City, for petitioner-appellant.

Larry R. Ruhmann, Rick V. Morris, Jefferson City, for respondent Mo. Div. of Emp. Sec.

Alan J. Downs, Jefferson City, for respondent Labor & Industrial Relations Com'n of Mo.

Before WASSERSTROM, P.J., and KENNEDY and NUGENT, JJ.

WASSERSTROM, Presiding Judge.

Claimant Smith applied for unemployment benefits, which were denied by a deputy of the Missouri Division of Employment Security. That denial was affirmed by an appeals referee and was approved on review by the Labor and Industrial Relations Commission. On petition for review, the circuit court affirmed, from which judgment Smith pursues the present appeal. We reverse and remand because of the failure by the administrative agency to fully explore the facts and develop an adequate record.

Smith worked as a laborer for Foundation Building Company ("Foundation") from August 1980 to May 1981 under the supervision of George Dusselier, Foundation's president. Foundation did work in both Kansas and Missouri. Smith, a resident of Kansas, filed for benefits under the Kansas unemployment compensation law soon after his termination and collected benefits for two weeks.

On July 14, 1981, Smith received notice from the Kansas agency of his ineligibility for benefits and the agency demanded repayment of $158 which had been paid to him. According to Smith, that notice and demand were triggered by statements made to the Kansas Division of Employment by Dusselier to the effect that Smith had left work for unknown reasons, that he had returned to work temporarily, but that he had again quit.

A hearing was held before the Kansas Division of Employment, resulting (according to Smith) in a ruling that Smith was entitled to unemployment benefits. Smith thereafter filed an interstate claim under Missouri law in September 1981, in which

he stated that his benefits under Kansas law had become exhausted on August 22, 1981. Notice of this new claim was sent to Foundation on September 15, 1981, and Dusselier returned the notice to the Missouri Division of Employment Security with a notation: "We have a job for this man. He won't come to work."

The Division then sent a letter to Smith dated October 19, 1981, advising him to report to George Dusselier of Foundation with respect to their job offer. Smith responded by returning the notice to the Division with the following notation written on the back: "I did not contact Geo. Dusselier, he is my last employer; When I first filed for unemployment benefits I was working for Geo. Dusselier. I was laid off-and did not go back. I received two (2) checks. Geo. Dusselier appealed. It was found in my favor. I will take any work form [sic] any employer except Geo. Dusselier. I will take any work from any previous employer except Geo. Dusselier."

On October 29, 1981, a deputy of the Missouri Division ruled that Smith was disqualified to receive any further benefits for the following reason: "The claimant refused without good cause an offer of work with his former employer for reasons unknown to the deputy. The work offered was suitable." Smith then duly appealed from that ruling, stating as his reason: "I don't beleive [sic] Geo. Dusselier had work." A hearing was held on that appeal before Larry L. Campbell, a Kansas Appeals referee who had been duly designated to take the testimony in electronic recorded form.

Smith testified that he had been laid off by Foundation in May 1981. He explained the manner of the lay off as follows: "Mr. Dusellier [sic] would never tell anyone he's laid off. He'd just say, we didn't have no work here at present, and it—it went on and on for weeks and I decided well, he's got no work, I'm gonna apply for unemployment benefits." With respect to his failure to report to Dusselier for work in response to the Division's notice of October 19, 1981, Smith explained his reasons as follows: "[F]irst of all, I didn't believe he

had work; secondly, that I had appealed it for the same reason, through Kansas, and the claims—or the Examiner of Kansas said that through my appeal that I left work without good cause and if he turned around and offered me work, I wouldn't have to accept it. And so that was the reason through Missouri, why I didn't—I just put that down on the form letter." His testimony then proceeded as follows:

Q. Let's go back there. You mentioned before we went on the record that you appeared at another hearing. Isn't that right?

A. Uh-huh.

Q. When was that?

A. Let's see. Okay. (Unintelligible)—the other hearing was July 22 at 12:00 noon, of '81.

Q. Who was the Referee?

A. Edward R. McQuinn.

Q. Can I see that notice? And he issued a decision in this matter?

A. Yes.

Q. Do you have that with you?

A. No, I asked—or called into the State to get another determination and they said it was just one per customer, they couldn't allow me another one.

Q. What was the result of the decision?

A. It wiped out overpayment, and it said that I had left work without good cause—or that I had left work with go-good cause 'cause I had—was laid off and re—re—decided not to return to that job.

. . . .

Q. Well, when you got this Agency letter then on October 18, did you contact this employer for work?

A. No.

Q. And would you state again why you did not contact this employer?

A. Two reasons actually. The first reason being that the—when I had appealed it the first time in Kansas, they said that I wouldn't have to take work with him again as long as I was making—working out for o—other work, being that—that I was laid off; and secondly, I didn't think he had work because people I knew—one

individual, Terry Shauncoursey, he was still employed for George Dusellier [sic] and wasn't working at the time.

Q. Who?

A. Terry Shauncoursey. He was still employed for George Dusellier [sic] and off—he didn't have no work, and so I figured it would be a deal he had minor work, enough for one day and get down there, and Mr. Dusellier [sic] over here's the type of man, I've seen him for other people to work down there, just call me every name in the book for no reason. Just, you know, just to be—ju—just be on their rearends constantly. I figured it would be a thing where I'd get down there, he'd ha—had or some (unintelligible) start a fight and are arguin' and that would be the end of the job right there. He—he—before, he had threatened to cut my pay and just do all kinds of stuff, you know, he's got a very foulmouth and if you say anything back to him, he says, (unintelligible) back or you're fired."

With respect to his failure to report to Foundation for work in October 1981, Smith further testified as follows:

"Q. Do you have anything else to say about your answers to that letter that was sent to you about possible employment with Foundation Company?

A. Yeah. I just don't believe they had work 'cause at the time, I would call in. He had people laid off.

Q. But how do you know whether they had work or not unless you called to find out?

A. The work wasn't suitable for me.

Q. All right. Why was the work not suitable?

A. I want full-time employment, not somethin' two or three hours a week. And I can't work with this man over here. I've never heard—never worked for anyone like him in my life."

When Dusselier was called upon, he testified as follows:

A. Oh, just some of this stuff he's been tellin' you (unintelligible) a lie about leaving. I mean, this is just hearsay and my word against his.

MR. SMITH: Well, I (unintelligible)—

MR. DUSELLIER [sic]: (Unintelligible)—

MR. SMITH: —I never (unintelligible).

MR. CAMPBELL:

Q. Did you appear at this other hearing that he's talking—

MR. DUSELLIER [sic]:

A. My wife, she's the secretary.

Q. What?

A. She—my wife is the secretary of the company.

Q. She appeared at th-this other hearing?

A. Uh-huh.

Q. Well, did the Referee rule that the claimant had good cause for leaving the work? (Unintelligible)—

A. I really don't know. I—you've probably got those records. I'm not sure....."

With respect to the existence of a work opening at Foundation in October 1981, Dusselier testified:

"Q. Was work available?

A. Well, let's see.

Q. That week?

A. I—I—I gotta get somethin' right here (unintelligible) let's see, now, this is October—

Q. 18th to the 24th.

A. Well, (unintelligible) people's paychecks.

Q. Well—

A. (Unintelligible).

Q. The only question I have for you though is—

A. Yeah, we—we did have work from the 2nd (unintelligible). Yes, we do...."

When Smith again challenged the existence of work at Foundation for him in October 1981, Dusselier responded as follows:

"A. Well, we—I guess probably the best way I could do was show you these—these stub-check stubs from the other guys...."

The check stubs referred to by Dusselier do not appear in the record, and apparently were never produced for inspection.

A significant question was asked of Dusselier with the following colloquy:

"Before Mr. Smith was laid off back in May, did you have some problems gettin' along together?

A. I—I—I tell you what I—I think I got—I know the reason he quit and it wasn't my fault, but I'd like to just talk to you without—without him bein' here.

Q. Well, we can't do that.

A. Well, maybe I—I should git [sic] some guys—some of the other help—

Q. Well, I—I'm gonna strike that question if you can't answer it. (Unintelligible)—

A. What was the question?

Q. My question was, before he was laid off back in May, was there any problems which made it difficult for the two of you to get along together while you were workin' together?

A. No. (Unintelligible)."

After the hearing was closed, the tape was transcribed and the transcript was sent to the Missouri Appeals Tribunal. On December 9, 1981, John H. Turnbull, a Missouri appeals referee, affirmed the deputy's determination that Smith was disqualified for benefits. Turnbull's decision in significant part reads as follows:

"It is found that the claimant failed on October 23, 1981, to accept work when offered by a former employer through the Division. It is believed and found that the claimant who filed a claim for this week contending that he was unemployed and active and earnestly looking for work would have made a contact with this employer to inquire whether or not there was actually work for him on that day. The fact that a Referee told him he did not have to accept work for this employer is not binding on this Referee in this matter. It is believed and found that the work offered to the claimant was similar to that which he had previously performed. There was no evidence that the wage was less than that paid for work such as this in the community. Therefore it is believed and found that the work offered to the claimant was suitable for the claimant and he did not have good cause to refuse to accept the work. Accordingly, I find that the claimant failed without good cause to apply for or accept available suitable work when offered by the employer on October 23, 1981, through the Division."

On this appeal, Smith complains that: (1) he was denied a fair hearing because the appeals tribunal failed to fully develop the facts; and (2) the decision that Smith refused work in October 1981 without good cause was contrary to the evidence. We will discuss those points in reverse order.

## I.

## GOOD CAUSE FOR REFUSING THE WORK OFFER

Section 288.050–1, RSMo.Supp.1982, provides:

"Notwithstanding the other provisions of this law a claimant shall be disqualified for waiting week credit or benefits until after he has earned wages equal to ten times his weekly benefit amount if the deputy finds

. . . .

3. That he failed without good cause either to apply for available suitable work when so directed by the deputy, or to accept suitable work when offered him, either through the division or directly by an employer by whom the individual was formerly employed...."

This statutory provision was the basis for the appeals referee's decision.

Smith argues that the appeals referee ignored the background relationship between the parties which did give Smith good cause to refuse the work offer in that: (1) there was a personality conflict between him and Dusselier; and (2) the prior Kansas agency decision in itself gave Smith good cause for not accepting a work offer by Foundation.

■ The treatment of an employee by his employer or supervisor may be so arbitrary and unacceptable to a person of ordinary reasonable sensitivity as to afford justification for the employee to quit the employment or to refuse any new employment by that employer.[1] *Dueweke v. Morang Drive Greenhouses,* 411 Mich. 670, 311 N.W.2d 712 (1981) (personality conflict); *Taylor v. Unemployment Compensation Board of Review,* 474 Pa. 351, 378 A.2d 829 (1977) (verbal abuse, profanity and racial discrimination); *Chamblee v. Employment Division,* 23 Or.App. 53, 541 P.2d 165 (1975) (harassment); *Associated Util. Serv., Inc. v. Board of Review, etc.,* 131 N.J.Super. 584, 331 A.2d 39 (1974) (intentional harassment by supervisor); *Stevenson v. Morgan,* 17 Or.App. 428, 522 P.2d 1204 (1974) (arbitrary harassment by supervisor); *Electrical Reactance Corp. v. Employment Compensation Board of Review,* 169 Pa.Super. 269, 82 A.2d 277 (1951) (unjust accusations, abusive conduct and profane language); Annot. 76 A.L.R.3d 1089 (1977).

The rule of the cases just cited was substantially approved in *Citizens Bank of Shelbyville v. Industrial Commission,* 428 S.W.2d 895 (Mo.App.1968) where the court cited and quoted with apparent approval from *Electrical Reactance Corp., supra,* as follows:

"In *Electrical Reactance Corp. v. Unemployment Compensation Board of Review,* 169 Pa.Super. 269, 82 A.2d 277, two clerical employees left work after 'objectionable conditions had existed for a long period of time' and their supervisor finally 'became abusive * * * arguing, cursing and swearing.' In upholding unemployment benefits the court said: 'To constitute good cause, the employes' [sic] leaving must be for "adequate excuses that will bear the test of reason, just grounds for action, and always the element of good faith." [Citing cases.] The circumstances here meet these tests. These claimants were not required to continue being subjected to unjust accusations, abusive conduct and profane language.'"

The *Citizens Bank* decision summarizes the requirement for "good cause" to be "where the unemployment is caused by external pressures so compelling that a reasonably prudent person would be justified in giving up employment." This concept of "good cause" was very fully considered in *Belle State Bank v. Ind. Com'n Div. of Emp. Sec.,* 547 S.W.2d 841, 846 (Mo.App.1977), where it was held in part: "[T]he words 'good cause' are not susceptible of precise definition and have no fixed meaning ... To constitute good cause, the circumstances motivating an employee to voluntarily terminate employment must be real not imaginary, substantial not trifling, and reasonable not whimsical, and good faith is an essential element. The standards as to what constitutes good cause is the standard of reasonableness as applied to the average man or woman, and not to the supersensitive...."

■ Thus, Smith proceeds on a sound legal premise in arguing that personal conflicts between an employer and an employee may be sufficiently aggravated to supply good cause for refusing employment. The trouble with Smith's position here, however, rests in the insufficiency of the evidence to adequately show that Dusselier was guilty of such conduct as to justify Smith in refusing to work for him again. The burden of proof was upon Smith. *Weber v. Labor & Indus. Rel. Commission,* 557 S.W.2d 669 (Mo.App.1977). There was no satisfactory evidence in this record as to the nature or extent of the conflict between the parties; nor was there any delineation of the issues which were raised before the Kansas agency concerning the May quitting or the manner in which those issues were resolved by the agency, other than the somewhat confused summary offered by Smith. Without more knowledge with respect to those mat-

---

1. Smith cites cases to support a distinction between the situation where an employee quits work as against a situation where an employee refuses to accept an offer of reemployment. He argues that less justification need be shown in the latter situation as compared to the former situation. For the purpose of this case, there is no need to explore the suggested distinction.

ters, no one could nor can we now reach an intelligent determination as to whether Smith had good cause to refuse an offer of employment from Foundation in October 1981. Although we hold for the reasons stated in part II of this opinion that the findings of the appeals referee should not stand, at the same time there is no sufficient basis in the present record upon which we could properly dictate an opposite conclusion, even if we were vested with fact finding authority. See Section 288.210, RSMo.Supp.1978.

## II.

### FAILURE TO DEVELOP THE FACTS

█ A duty rests upon the agency administering the beneficent social security laws to exercise considerable responsibility to explore the factual aspects of each situation which tend to prove or disprove the right of the claimant. The claimants are usually poor and inexperienced in legal matters, the sums involved are small and the claimants are rarely represented by counsel. Regulation 8 CSR 10–5.010(8) therefore appropriately provides: "The appeals tribunal shall follow in each case that procedure which it believes will best develop all of the pertinent facts with respect to the issues without regard to common law or statutory rules of evidence and other technical rules of procedure. The appeals tribunal may examine all parties and witnesses and shall determine the order of procedure for each hearing."

Statutes and regulations in other jurisdictions covering this type of proceeding have been interpreted to require the hearing officer to assume an active role in developing the facts. Thus, for example, in *Fernandez v. Schweiker*, 650 F.2d 5 (2d Cir.1981) a denial of disability benefits was reversed because of the failure of the administrative judge to adequately develop the facts, the court holding: "[T]he administrative judge has a duty to 'adequately protect the rights of [a] pro se litigant by ensuring that all of the relevant facts were sufficiently developed and considered.'"

Similarly, in *Marsh v. Harris,* 632 F.2d 296 (4th Cir.1980) a denial of benefits was reversed because the administrative law judge had failed to adequately develop the evidence. The court held that particularly where the claimant is without counsel in a social security disability case "the ALJ should 'scrupulously and conscientiously probe into, inquire of, and explore for all the relevant facts,' ..." Other federal cases holding to the same effect are *Milton v. Schweiker,* 669 F.2d 554 (8th Cir.1982); *Driggins v. Harris,* 657 F.2d 187 (8th Cir. 1981); *Diabo v. Secretary of Health, Ed. & Welfare,* 627 F.2d 278 (D.C.1980); *Dobrowolsky v. Califano,* 606 F.2d 403 (3d Cir. 1979); *Hess v. Secretary of Health, Education & Welfare,* 497 F.2d 837 (3d Cir.1974); *Gold v. Secretary of Health, Education & Welfare,* 463 F.2d 38 (2d Cir.1972).

The state decisions reach the same result. Thus in *Krauss v. A. & M. Karagheusian, Inc.,* 13 N.J. 447, 100 A.2d 277 (1953), Judge Brennan (now Justice on the United States Supreme Court) held:

"Plainly the statute casts upon the agency, as respects both original and appellate determinations, the role actively to press the interested parties to produce all relevant proofs at their command and, when necessary, independently to take steps to get the facts, as, for example, when the record made by the parties is unsatisfactory or there is fair reason to doubt the reliability of the proofs as a basis for decision or the agency in any case has reason to believe that additional facts obtained and made part of the record on its own initiative will contribute to a correct result. [citing cases]."

*Employment Security Commission v. Doughty,* 13 Ariz.App. 494, 478 P.2d 109 (1971) is another typical case where the court held that proceedings of this nature are not strictly adversary and that there are circumstances in which the commission may be required to take more than a passive role in the fact finding process.

The rule established by the foregoing cases was acknowledged in effect by *Belle State Bank v. Ind. Com'n. Div. of Emp.*

*Sec., supra,* where the court castigated the failure of the appeals referee to adequately develop the facts: "On the face of it, the referee's shallow, superficial and cursory interrogation of claimants apparently intended to satisfy the above-quoted statutory condition of eligibility for benefits, i.e., that each of them was 'actively and earnestly seeking work,' was patently inadequate and insufficient to admit of an informed conclusion as to whether or not either claimant had satisfied that statutory condition of eligibility."

 The duty which rested upon the agency to develop the pertinent facts was not performed here. It quickly appeared at the hearing held on November 25, 1981, that a very strained relationship existed between Smith and Dusselier. Referee Campbell did make an initial effort to explore the background and reason for those problems; but when Dusselier indicated that he wanted to discuss that matter out of Smith's presence, the referee reacted by saying "I'm gonna strike that question if you can't answer it." Although Dusselier then apparently made some further effort to answer the question, the transcript at this point shows the record to be "unintelligible."

Quite obviously a good deal of the bad feeling between the parties arose from the fact that Dusselier challenged Smith's application for unemployment benefits in May 1981 and actively opposed that claim by Smith before the Kansas Division of Employment. Moreover, Smith relied very largely on the determination in the Kansas case as justification for his refusal to pursue any work application with Foundation in October 1981. Nevertheless, despite the obvious relevance of the Kansas proceedings, the record here is unacceptably vague concerning the precise issues presented and the exact ruling made in that Kansas proceeding.

The pertinent documents from the Kansas proceedings could and should have been made a part of the present record. Those Kansas records would have been available under the provisions of KSA Section 44–714(k) which provides for the exchange of information by the Kansas Division of Employment with similar administrative agencies of other states. The access to that information should have been particularly easy in the present case in view of the fact that the November 1981 hearing was being held in Kansas at the office of the Kansas Division of Employment, before an appeals referee of that agency.

Of lesser importance, but along the same line, Dusselier repeatedly referred to payroll records in his possession which he indicated would be the best evidence of whether Foundation did in fact have work available for Smith in October 1981. Yet the referee did not ask Dusselier to produce those records, and those records are not part of the evidence which was sent to the Missouri Appeals Tribunal for evaluation. Not only would those payroll records have been pertinent to the question of whether there was a job available for Smith in October 1981, but also the existence or nonexistence of a job in October would have a strong bearing on Dusselier's sincerity and truthfulness and would tend to prove or disprove whether Smith did in fact have good cause for not wanting to do any more work under Dusselier.

Enough appears on this record to at least raise a reasonable suspicion that Smith had been subjected to harassment on his job under Dusselier, that Dusselier and his wife had wrongfully tried to defeat Smith's application before the Kansas Agency by false testimony, and that Dusselier's statement that a job was available for Smith in October was not a bona fide offer of an existing work opportunity. Maybe some of those suspicions may have been answered by those parts of the record which are reported as "unintelligible," but if so the present record is just as incomplete as if the questions in issue had never been asked or answers given. The information and testimony marked repeatedly in this transcript as "unintelligible" was unavailable to the Missouri appeals referee who made the determination, to the Commission which reviewed it, to the circuit court on its review,

and is also unavailable to us on the present review. Those omissions should have been cured. See *Softexture Yarns, Inc. v. Board of Review,* 59 N.J.Super. 57, 157 A.2d 142 (1960).

The judgment is reversed and the cause remanded with instructions for the circuit court to remand this proceeding to the Commission for a further hearing by that agency to develop further facts in the respects referred to above and for new findings in light of those additional facts.

All concur.